UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT M. JENNINGS,                          :

              Plaintiff,          :          11 Civ. 0887 (RJS) (AJP)

       -against-                :          **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of           :
Social Security,
                          :
          Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Richard J. Sullivan, United States District Judge:**

        Plaintiff Robert M. Jennings, represented by counsel, brings this action pursuant to

§ 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security (the "Commissioner") denying him Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB").  (Dkt. No. 1: Compl.)  Presently before the Court

is Jennings' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 8:

Notice of Motion), and the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 10:

Gov't Notice of Cross-Motion).

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be <u>DENIED</u>, and Jennings' motion for judgment on the pleadings should be

<u>GRANTED</u> and the case remanded to the Commissioner for further proceedings.

## FACTS

### Procedural Background

On May 23, 2007, Jennings filed for SSI and DIB benefits, alleging that he had been disabled since October 1, 2005.  (See Dkt. No. 7: Administrative Record filed by the Commissioner ("R.") 93-95, 98-100, 115.)  Jennings claimed to suffer from "[e]motional anxiety, extreme mood swings, inability to concentrate for extended periods of time [and] chest discomfort." (R. 121.)  On November 23, 2007, the Social Security Administration ("SSA") found him not disabled and denied his claim.  (R. 47-54.)  On December 26, 2007, Jennings requested an administrative hearing.  (R. 55-56.)

Administrative Law Judge ("ALJ") Katherine Edgell conducted a hearing on June 24, 2009.  (R. 28-46.)  Jennings appeared without counsel.  (R. 30-31.)  On August 19, 2009, ALJ Edgell issued a written decision finding Jennings not disabled.  (R. 18-27.)  ALJ Edgell's decision became the Commissioner's final decision when the Appeals Council denied Jennings' request for review on December 16, 2010.  (R. 1-4.)

The issue before the Court is whether the Commissioner's decision that Jennings was not disabled between October 1, 2005 and August 19, 2009 is supported by substantial evidence.

### Non-Medical Evidence

Jennings was born on April 23, 1948 and was fifty-seven years old at the alleged onset of his disability.  (R. 34, 93.)  Jennings is a high school graduate.  (R. 35, 125, 172.)  From April 1994 to April 1997, Jennings worked for the City of Rye at the Rye Golf Club as a golf club ranger, where he directed traffic on the greens.  (R. 37-38.)  From August 1997 to September 2003,

Jennings worked as a general mail clerk, which required him to stand all day and lift up to fifty pounds while sorting and delivering mail for a private company.  (R. 36-37, 126.)  When the company relocated, Jennings stopped working and collected unemployment benefits for six months.  (R. 37.)  Jennings continued to seek employment after he lost his job in 2003.  (R. 126.)  Except for two brief periods in September 2005 and August 2008, Jennings was unable to secure employment.  (R. 36, 126.)  In August 2008, he quit the Stop & Shop job after two weeks because he could not focus or concentrate.  (R. 36.)  Jennings explained that he felt fine physically but in any stressful situation he could not focus or concentrate; he could do one assignment but if he were given multiple assignments he forgot them and got depressed.  (R. 38-39, 40-41.)

Jennings lives with his ex-wife in a fourth floor walk-up apartment.  (R. 33, 128.)  Jennings lived with his sister for the five years prior to living with his ex-wife.  (R. 34.)  Jennings testified that he typically gets up at 5:30 am, makes coffee for his ex-wife, and goes jogging.  (R. 41-42, 129.)  Jennings stated that he does not do any other substantial activities other than household chores such as washing the dishes, making simple meals, doing his own laundry, and shopping for his ex-wife.  (R. 42-43, 129-32.)   Jennings testified that he listens to the radio and watches television.  (R. 42.)  Other than visiting his sister every few weeks, Jennings said that he did not have any other social outlets.  (R. 44.)   Jennings "isolate[s]" himself from others, feeling uncomfortable in social situations.  (R. 133.)  He handles criticism and stress poorly.  (R. 134-35.)

**Medical Evidence**

**Consultative Examinations:  November 2007**

Jennings had two consultative examinations on November 12, 2007:  Dr. William Lathan and Dr. Josephine Minardo conducted the internal medicine and psychiatric evaluations, respectively.  (R. 168-70, 172-76.)[1]  Dr. Lathan observed that Jennings was "appropriate in dress and affect, somewhat anxious, cooperative and oriented in all spheres."  (R. 168.)  He also noted a history of depression and recommended a psychiatric consultation.  (R.170.)

During Jennings psychiatric evaluations, Dr. Minardo noted that Jennings drove approximately ten miles to the appointment.  (R. 172.)  Jennings said that his parents both suffered from alcoholism and his sister suffers from depression and an unspecified cognitive problem.  (R. 173.)  Jennings reported frequent awakenings up to twice a night, but that he had not suffered from serious depression in ten years.  (R. 172.)  When questioned by Dr. Minardo specifically, Jennings admitted "symptoms of dysphoric mood, guilt, hopelessness, loss of usual interest, fatigue/loss of energy, worthlessness, diminished self-esteem, concentration difficulties, social withdrawal, isolation, and apathy."  (R. 173.)  While Jennings denied current suicidal ideation, he admitted "some passive desire to cease living."  (R. 173.)  Dr. Minardo noted that Jennings had symptoms of subjective anxiety evidenced by apprehension, worry, restlessness and difficulty concentrating, but denied having panic attacks or manic symptoms.  (R. 173.)  Jennings reported feeling that others

---

[1]    Because Jennings' motion is limited to the issue of his mental residual functional capacity (see R. 136: "My condition is not physical."; see also Dkt. No. 8: Jennings Br. at 7-14), this Report and Recommendation will not summarize the evidence as to Jennings' physical condition.

talked about him.  (R. 173.)  Dr. Minardo noted that Jennings' cognitive symptoms were limited to short-term memory and concentration difficulties.  (R. 173.)

During the examination, Jennings was cooperative, friendly and well related.  (R. 174.)  Dr. Minardo noted that Jennings "was dressed casually, but was neat, appropriate, and well groomed."  (R. 174.)  Dr. Minardo stated that Jennings' thought processes were "coherent and goal directed," affect was "[r]estricted," mood was "[d]ysthymic," sensorium was clear, and attention and concentration were "[g]rossly intact."  (R. 174.)  Dr. Minardo found that Jennings' recent and remote memory skills were slightly impaired and that both his judgment and insight were fair.  (R. 174.)  While Jennings "was able to recall 3 out of 3 objects immediately," he only was able to recall "1 out of 3 objects after five minutes."  (R. 174.)  "He completed 4 out of 4 digits forward and 2 out of 3 digits backwards."  (R. 174.)  Dr. Minardo observed that Jennings' intellectual functioning was in the low-average range.  (R. 174.)

Jennings reported that he was able to dress, bathe, and groom himself, as well as cook, clean, do laundry and shop.  (R. 174.)  He stated that he was able to both drive and take public transportation, but that he had problems budgeting his money.  (R. 174-75.)  He reported only socializing with his ex-wife and that he spent most of his day in the house, sitting, watching TV, listening to the radio, trying to read, and performing chores.  (R. 175.)

Dr. Minardo found that Jennings could "follow and understand simple directions and instructions," "perform simple tasks independently," "maintain attention and concentration with simple material," and "make appropriate decisions."  (R. 175.)  However, Dr. Minardo noted that Jennings "may have some difficulty maintaining a regular schedule, learning new tasks, and

performing complex tasks."  (R. 175.)  In addition, Jennings avoided interpersonal contact due to difficulties in relating to others who he does not know.  (R. 175.)

Dr. Minardo diagnosed Jennings with major depressive disorder, moderate, without psychotic features; rule out anxiety disorder on Axis I; and schizoid personality disorder by history on Axis II.  (R. 175.)[2/]  Dr. Minardo noted that "[t]he results of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  (R. 175.)  Dr. Minardo strongly recommended that Jennings begin individual psychological therapy to address interpersonal functioning issues, and she stated that the prognosis was good if Jennings complied.  (R. 175-76.)

On a Psychiatric Review Technique form dated November 21, 2007, state agency psychiatrist Dr. Drucker found that Jennings suffered from affective disorder (§ 12.04) with "[d]isturbance of mood," and substance addiction disorder (§ 12.09).  (R. 177, 180, 185.) Dr. Drucker found that Jennings had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace,

---

[2/]   These diagnoses reflect use of the multi-axial system of assessment, where each Axis refers to a different domain of information that may help the clinician to plan treatment and predict outcome.  Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions.  Not utilized by Dr. Minardo, but part of the multi-axial system of assessment, Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment of functioning ("GAF").  GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning.  (Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 27, 32, 34 (4th edition Text Revision 2000).

and one to two episodes of deterioration, each of extended duration.  (R. 187.)  Dr. Drucker found that the evidence did not support the presence of the § 12.04(C) criteria.  (R. 188.)

On November 21, 2007, Dr. Drucker completed a Mental Residual Functional Capacity Assessment of Jennings.  (R. 197-200.)  Dr. Drucker found that Jennings was moderately limited in his ability to understand and remember detailed instructions, and to carry out detailed instructions.  (R. 197.)  In all other categories, Dr. Drucker found that Jennings was not significantly limited.  (R. 197-98.)  Dr. Drucker noted that Jennings' mental status evaluation was normal except for a depressed mood.  (R. 198.)

### Treating Physicians at the Veterans Affairs Medical Center:  November 2007 - July 2009

On November 30, 2007, Jennings saw Dr. John Sanderson at the Bronx Veterans Affairs Medical Center ("VAMC") for an annual physical examination.  (R. 265-272.)[3]  Jennings reported suffering from non-exertional chest tightness and heaviness for the past two to two-and-a-half years, with the episodes occurring  approximately twice a week.  (R. 265, 270.)  Jennings stated that he often felt anxious, was not taking any medication and jogged three to four times a week.  (R. 266.)  He was discharged from the military early due to "'schizoid'" personality disorder.  (R. 266.)  His medical history included anxiety and alcohol abuse, but he claimed sobriety for the past three years.  (R. 265.)  Dr. Sanderson observed that Jennings was "anxious/tense" and diagnosed Jennings

---

[3]      From October 1, 2005 to November 29, 2007, Jennings did not receive medical treatment. (R. 172, 261, 270.)  In November 2007, Jennings stated that he had not seen a physician in over two years because of financial reasons.  (R. 270.)

with atypical chest pain and anxiety with a possible personality disorder.  (R. 266-67.)  Dr. Sanderson referred Jennings to the psychiatric clinic.  (R. 267-68.)

On December 20, 2007, VAMC social worker Malkah Lesman-Kaplan met with Jennings.  (R. 260.)  Jennings stated that in 1968-69, he was diagnosed as "'[s]chizoid'" and was hospitalized for two months at Walter Reed Hospital.  (R. 260.)  In 1976-77, Jennings was treated at the Tuckahoe Mental Health Clinic and was on psychiatric medications.  (R. 261.)  Jennings reported that he felt hopeless and anxious, dissociates when under stress, has a lack of interest, and suffers from poor concentration.  (R. 261.)  Jennings stated that he lived with his sister until February 2007, when they had to vacate because the house was being sold.  (R. 260.)  Jennings reported that at the time he became desperate and had thoughts of hanging himself; however, he said that he did not actually have the intent and no longer felt that way.  (R. 260.)  Also on December 20, 2007, Jennings met with psychiatrist Dr. Vanessa Hiraldo who prescribed Paroxetine for his "mood." (R. 259, 252-53.)[4]

On February 28, 2008, Jennings met with Lesman-Kaplan and social work intern Germaine Ogiste for therapy and job counseling.  (R. 252.)  Jennings reported that he felt "'emotionally dead,'" but denied suicidal and homicidal ideation.  (R. 252.)  He also noted "depressive symptoms of increased sleep, lost interests, lack of energy, and not being able to concentrate."  (R. 252.)  The social workers recommended that Jennings follow-up with the Department of Labor and have ongoing job counseling sessions. (R. 253.)  On March 27, 2008 and

---

[4]      Paroxetine is sold under the brand name Paxil.  Physicians' Desk Reference 1491 (65th ed. 2011).

April 3, 2008, they discussed additional employment options, including that Jennings visit One Stop Employment and Compensated Work Treatment Program.  (R. 250, 251.)

During an appointment with Ogiste and Lesman-Kaplan on April 3, 2008, Jennings stated that he may not be able to find employment because of his preference to be isolated.  (R. 250.) Jennings attributed this to "his parents instilling their intensely religious values on him" and their "negative attitude towards him."  (R. 250.)  He also reported unresolved anger issues as a result of his relationship with his parents, which he controls by avoiding conflict with others.  (R. 250.) Jennings reported having daily childhood flashbacks that last twenty to thirty seconds.  (R. 250.) He also said he attended three high schools in four years due to his inability to focus and was discharged from the army "due to his unstable mood."  (R. 250.)  Jennings stated that he was able to control his emotions now that he was older.  (R. 250.)

On April 17, 2008, Jennings met with Dr. Hiraldo for a scheduled appointment.  (R. 248.)  Jennings reported that he had stopped taking Paroxetine about three weeks earlier because he experienced vivid violent dreams and fatigue that prevented his morning exercise.  (R. 248.) Jennings felt much better off the drug, and the side effects resolved.  (R. 248.)  Jennings reported that he was still searching for a job, went to a job fair, visited One Stop Employment and gave a veterans counselor his resume.  (R. 248.)  He also reported that when he has money he has cravings for alcohol and agreed to consider Alcoholics Anonymous.  (R. 248.)  Jennings noted that he wanted to correct some information from their prior session:  he prefers to be alone and not to be bothered with other's issues; his only friend is his ex-wife; his sister is also a loner, which he attributes to their childhood experiences; and he believes that he has learned how to manage his anxiety around others.

(R. 248-49.)  Dr. Hiraldo diagnosed Jennings with social anxiety disorder, alcohol dependence in remittance, and rule-out schizoid personality disorder.  (R. 249.)  Jennings' GAF score was 70.  (R. 249.)[5]  On May 12, 2008, Jennings left a message for Dr. Hiraldo that he was feeling anxious and had resumed taking Paroxetine with good effect.  (R. 246.)

On May 28, 2008, Jennings met with Lesman-Kaplan and reported that he still was looking for employment.  (R. 244.)  Jennings reported "'phasing out'" to a "'private universe.'"  (R. 244.)  As a child, he would go to his own world, and he said he was doing this with increased frequency.  (R. 244.)

On June 10, 2008, Jennings had a routine appointment with Dr. Sanderson where he reported that the Paroxetine was helping and he was "less anxious than before."  (R. 241.)  Dr. Sanderson assessed that Jennings had a personality disorder.  (R. 242.)

On July 14, 2008, Dr. Hiraldo saw Jennings, who reported improvement on Paroxetine, including improved concentration for reading.  (R. 238.)  Jennings stated that he goes to the library and to the marina for relaxation.  (R. 238.)  Dr. Hiraldo noted that Jennings appeared stable and euthymic and that he remains future-oriented and engaged in treatment.  (R. 238.)  Jennings identified his next goal in treatment as "improved socialization with better ability to tolerate everyday annoyances, less irritability, [and to] work on pent[-up] resentments from early life."  (R. 238.)

---

[5]    A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  (DSM-IV-TR at 34.)

On August 4, 2008, Jennings called Lesman-Kaplan and said that he started a part-time job at Stop & Shop, was "very happy," and would call for an appointment because he did not want his case closed.  (R. 235.)

At a December 12, 2008 appointment with Dr. Sanderson, Jennings reported feeling well psychiatrically and noted that his mood was upbeat on Paxil.  (R. 230.)

On December 22, 2008, Jennings met with Dr. Hiraldo and reported that he had lost the supermarket job because he had trouble multi-tasking and focusing.  (R. 228.)  Since he stopped interacting with others, Jennings' episodes of irritability and anxiety subsided.  (R. 228.) Dr. Hiraldo noted that Jennings' mood was okay, he was able to smile and engage in light humor.  (R. 228.) Dr. Hiraldo diagnosed Jennings with social anxiety disorder versus schizoid personality disorder with elements of loneliness, and prescribed Aripiprazole[6/] and discontinued Paxil.  (R. 228.) Jennings' GAF score was 68.  (R. 229.)

At a January 5, 2009 scheduled appointment with Lesman-Kaplan, Jennings reported that he quit his job at Stop & Shop.  (R. 227.)  Over the past two months, Jennings noted "difficulty multi-tasking, and cognitive gaps."  (R. 227.)  While he had stopped taking Paxil, he had not yet started Abilify.  (R. 227.)  Jennings noticed mood changes and feeling apathetic.  (R. 227.)  On January 22, 2009, Jennings met with Lesman-Kaplan and reported that while Abilify increased his ability to focus and concentrate, he felt more irritable.  (R. 225-26.)  He also commented on his failure to secure a good paying job due to his lack of job skills, as well his issues with authority and low self-esteem.  (R. 226.)

---

[6/]      Aripiprazole is sold under the brand name Abilify.  Physicians' Desk Reference 3458.

During his February 5, 2009 session with Lesman-Kaplan, Jennings reported feeling better and stable.  (R. 223.)  During his appointment with Dr. Hiraldo the same day, Dr. Hiraldo noted that Jennings' mental status was improved, he had a brighter affect, was more related, he laughed and joked, and his thoughts were linear and logical.  (R. 224.)  Dr. Hiraldo increased the dosage of Aripiprazole.  (R. 224.)  Dr. Hiraldo found that there was no major depression, suicidal ideation or psychosis.  (R. 224.)  Jennings was able to spell "world" backwards and draw a clock to 2:50, but he could not complete serial sevens.  (R. 224.)  Dr. Hiraldo assessed social anxiety disorder versus schizoid personality disorder with the element of loneliness.  (R. 224.)

On February 6, 2009, Dr. Sanderson completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) for Jennings.  (R. 273-78.)  Dr. Sanderson concluded that Jennings could occasionally lift and carry up to 50 pounds and, during an eight-hour workday, sit for up to eight hours, stand for up to six hours, and walk for up to three hours.  (R. 274.)  Dr. Sanderson further noted that Jennings suffered from mental health issues including anxiety and personality disorder, and should avoid high-stress and high-pressure situations.  (R. 278.)

On July 9, 2009, Dr. Hiraldo completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Jennings and a Psychiatric Review Technique Form.  (R. 279-95.)  Dr. Hiraldo found that Jennings had an extreme restriction in his ability to make judgments on complex work-related decisions; marked restrictions regarding his ability to understand, remember and carry out complex instructions and to make simple work-related judgments; moderate restrictions in his ability to carry out simple instructions; and a mild restriction to understand and remember simple instructions.  (R. 279.)  Dr. Hiraldo noted that Jennings was unable to recall two

objects after two minutes, to do calculations or to perform serial seven subtractions.  (R. 279.)

Dr. Hiraldo also found that Jennings had marked restrictions in his ability to respond appropriately

to usual work situations and to changes in a routine work setting and in his ability to interact

appropriately with co-workers, and moderate restrictions in his ability to interact appropriately with

supervisors and the public.  (R. 280.)  She noted that these conclusions were due to Jennings'

inability to maintain a job at Stop & Shop because he was unable to follow multiple instructions,

was unable to get along with co-workers, felt overwhelmed and unable to function adequately.  (R.

280.)  Dr. Hiraldo opined that the limitations were present back to December 20, 2007.  (R. 280.)

In the Psychiatric Review Technique, Dr. Hiraldo diagnosed Jennings with § 12.04

affective disorder (R. 285); § 12.06 anxiety-related disorder (R. 287); § 12.08 personality disorder

(R. 289); and § 12.09 substance abuse disorder (R. 290).  Dr. Hiraldo found that Jennings had no

restrictions of activities in daily living, mild difficulties in maintaining social functioning, marked

difficulties in maintaining concentration, persistence or pace,  and no episodes of decompensation.

(R. 292.)  Furthermore, she found that Jennings had a medically documented history of affective

disorder of at least two years' duration that has caused more than a minimal limitation of ability to

do any basic work activity, with symptoms or signs currently attenuated by medication or

psychosocial support, and a residual disease process that has resulted in such marginal adjustment

that even a minimal increase in mental demands or change in the environment would be predicted

to cause the individual to decompensate.  (R. 293.)

**The ALJ's Decision**

In a written decision on August 19, 2009, ALJ Edgell denied Jennings' application for SSI and DIB for the period beginning October 1, 2005.  (R. 18-27.)  ALJ Edgell reviewed Jennings' claim of disability resulting from anxiety, concentration deficits and chest discomfort, considering both his testimony and the medical record.  (R. 21-27.)

ALJ Edgell found that Jennings' "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Jennings' "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible."  (R. 26.)  In particular, ALJ Edgell noted that although Jennings claimed "that his disability commenced in October, 2005, there is no medical evidence preceding 2007."  (R. 26.)  ALJ Edgell found that "the degree of medical treatment in this case is not commensurate with contentions of total disability" because all treatment had "been solely conservative in nature" and Jennings "reported good response to medications."  (R. 26.)  Further, ALJ Edgell found that the "evidence shows that [Jennings] remains quite functional with respect to his activities of daily living" because he "is fully independent in all aspects of his self-care," he "can drive a car by himself and participate in all activities of daily living," and he "exercises vigorously, including doing pushups and sit-ups and jogging daily."  (R. 26.)

ALJ Edgell applied the appropriate five-step legal analysis (see R. 25-27) as follows: First, ALJ Edgell found that Jennings had not "engaged in substantial gainful activity since October 1, 2005, the alleged onset date."  (R. 25.)  Second, ALJ Edgell determined that Jennings had "severe impairments: a major depressive disorder; a social anxiety disorder and atypical chest pain."  (R.

25.)  Third, ALJ Edgell found that Jennings did "not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments."  (R. 25.) ALJ Edgell

determined that Jennings

> has the residual functional capacity to perform medium work . . . that is primarily comprised of simple, rote, repetitive tasks and that does not require extensive interaction with co-workers. . . . [Jennings] can lift/carry up to 50 pounds occasionally and 25 pounds frequently.  During the course of an 8-hour workday, he can sit for 6 hours, stand for 6 hours, and walk for 6 hours.

(R. 25.)  As to Jennings' mental capacities, ALJ Edgell concluded:

> Specifically, there is no objective basis for assessing marked restrictions in any of the four Part B psychiatric review technique form (PRTF) categories which are applicable to mental disorders as contained in section 12.00 of the listings.

(R. 25.)  ALJ Edgell added that:

> Concerning [Jennings'] mental status, it is concluded that he has a major depressive disorder and a social anxiety disorder within the context of medical listings 12.04 and 12.06 respectively.  These conditions have resulted in no limitations of [Jennings'] ability to conduct his activities of daily living; and moderate restrictions for sustaining social functioning and maintaining concentration, persistence and pace.  There have been 1-2 episodes of decompensation reflected within the objective medical evidence of record.  It is therefore concluded that [Jennings] is able to perform work that is primarily comprised of simple, rote, repetitive tasks and that does not entail extensive interaction with co-workers.  This assessment is somewhat consistent with the impressions of psychiatrist Mejias-Hiraldo, as well as the examination findings of psychologist Minardo.

(R. 25-26, record cites omitted.)  Fourth, ALJ Edgell determined that Jennings was "capable of

performing past relevant work as a mail clerk."  (R. 27.)[7/]  ALJ Edgell concluded that Jennings was

---

[7/]     ALJ Edgell noted that Jennings "acknowledged that this work activity did not cease as a result of any medical or mental condition, but due to his employer's relocation."  (R. 27.)

not "under a disability, as defined in the Social Security Act, from October 1, 2005 through the date of this decision."  (R. 27.)

## ANALYSIS

## I.     THE APPLICABLE LAW

### A.     Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).[8]

An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that

---

[8]     See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[9/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[10/]

B.    **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. E.g., 42 U.S.C. § 405(g); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran

---

[9/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[10/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[11/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[12/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[13/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."

---

[11/]  See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[12/]  See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[13/]  See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[14/]  However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive

---

[14/]   See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

> step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[15] accord, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[16]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[15]    Amendments to 20 C.F.R. § 404.1520 became effective September 25, 2003.  See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156.

[16]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barhnart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[17]

### C.    The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[18]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

---

[17]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[18]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47;  Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[19/]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . .  report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence consider by the ALJ."); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set

---

[19/]    See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

   The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

  **D.**  **The ALJ's Duty to Develop the Record**

   It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record:

> [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [cert. denied, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), reh'g granted in part and denied in part, 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant).   Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).   "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[20/]  This duty is elevated when the claimant

is pro se:

> When a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are "heightened." The ALJ must "adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered" and by "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." And when a claimant appears pro se and is otherwise impaired, we must "make a searching investigation of the record to make certain that the claimant's rights have been adequately protected."

Moran v. Astrue, 569 F.3d at 113 (citations & fns. omitted).

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO JENNINGS' CLAIMS

### A.   Jennings Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Jennings was engaged in substantial gainful activity after

his application for SSI and DIB benefits.  "Substantial gainful activity" is defined as work that

involves "doing significant and productive physical or mental duties" and "[i]s done (or intended)

for pay or profit."  20 C.F.R. § 404.1510.  ALJ Edgell's conclusion that Jennings had not engaged

in substantial gainful activity during the applicable time period (see page 14 above) is not disputed.

(See Dkt. No. 11: Gov't Br. at 16.)  The Court therefore proceeds to the second step of the five-step

analysis.

---

[20/]   See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416912(d), 416.912(e)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

**B.** **Jennings Demonstrated A "Severe" Physical And Mental Impairment That Significantly Limited His Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Jennings proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . "[d]ealing with changes in a routine work setting."

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Edgell determined that the medical evidence indicated that Jennings had "severe impairments [of] a major depressive disorder[,] social anxiety disorder and atypical chest pain." (See pages 14-15 above.)  This finding is not disputed.  (See Dkt. No. 11: Gov't Br. at 16-17.)  The Court therefore proceeds to the third step of the five-step analysis.

### C.     The ALJ's Finding That Jennings Did Not Have A Disability Listed in Appendix 1 of the Regulations Cannot Be Affirmed Because the ALJ Failed to Adequately Develop the Record And Explain Her Decision

The third step of the five-step analysis requires a determination of whether Jennings had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

While ALJ Edgell found that Jennings' medically-determinable impairments were "severe," she found that Jennings did "not have an impairment or combination of impairments that [met] or medically [equaled] one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 25; see pages 14-15 above.)  Appendix 1 provides a categorization of mental impairments, including mental disorders.  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00.  Jennings argues that ALJ Edgell failed to consider whether he met the criteria in Listing § 12.04(C).  (Dkt. No. 8: Jennings Br. at 7-9.)[21]

---

[21]     The Court does not address whether Jennings' social anxiety disorder or atypical chest pain qualifies as a listed impairment because Jennings does not dispute ALJ Edgell's findings
(continued...)

In order to qualify for a disability, Jennings' depression must qualify as an affective

disorder.  20. C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Section 12.04 defines affective disorder,

as an impairment:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or
>
> i. Hallucinations, delusions, or paranoid thinking; or
>
> 2. Manic syndrome . . . . or

----

21/     (...continued)
with regard to these impairments.  (See Jennings Br. at 7-14.)

3. Bipolar syndrome . . . .

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

ALJ Edgell determined that Jennings suffers from a major depressive disorder at the second step of the five-step analysis.  (See pages 14-15 above.)  Presumably, that means that ALJ Edgell found that Jennings satisfied § 12.04(A), but ALJ Edgell only specifically made a finding as to § 12.04(B).  With regard to § 12.04(B), ALJ Edgell found that Jennings had (1) no restriction of activities of daily living, (2) moderate difficulties in maintaining social functioning, (3) moderate

difficulties in maintaining concentration, persistence, or pace, and (4) only one to two episodes of decompensation, concluding that Jennings' depression did not satisfy the § 12.04(B) requirements. (See page 15 above.)

As ALJ Edgell noted, these findings are somewhat consistent with the conclusions of treating physician Dr. Hiraldo and consulting physician Dr. Drucker. Dr. Hiraldo found that Jennings had (1) no restrictions of activities in daily living, (2) mild difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence or pace and (4) no episodes of decompensation. (See page 13 above.) Dr. Drucker found that Jennings had (1) a mild restriction of activities of daily living, (2) mild difficulties in maintaining social functioning, (3) mild difficulties in maintaining concentration, persistence or pace, and (4) one to two episodes of deterioration, each of extended duration. (See pages 6-7 above.) Because Jennings did not have "[m]arked" difficulties in two or more categories, and no evidence of "[r]epeated episodes of decompensation, each of extended duration," substantial evidence supports ALJ Edgell's decision that Jennings did not satisfy § 12.04(B).

ALJ Edgell, however, failed to discuss the § 12.04(C) criteria. After discussing the § 12.04(B) requirements, she simply concluded that Jennings did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1-Listing of Impairments." (See page 15 above; R. 25-26.) This is consistent with the findings of Dr. Drucker, who explicitly found that the evidence did not support the presence of the "C" criteria. (See page 7 above.) However, it is inconsistent with the findings of treating physician Dr. Hiraldo, who found that Jennings had a medically documented history of

affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.  (See page 13 above.)

Where there are inconsistent medical assessments, the ALJ must resolve those conflicts.  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").  However, before rejecting a treating physician's opinion as unsupported by medical evidence, the ALJ has an affirmative duty to develop the record in this regard.  When controlling weight is not given to a treating physician's opinion, the ALJ must consider the factors in 20 C.F.R. § 404.1527(d)(2)-(6) and 20 C.F.R. § 416.927(d)(2)-(6).  While ALJ Edgell stated that she "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927" (R. 26), she failed to discuss the "'[l]ength of the treatment relationship and the frequency of examination'; the '[n]ature and extent of the treatment relationship'; the 'relevant evidence . . . , particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)); see also, e.g., Pimenta v. Barnhart, 05 Civ. 5698, 2006 WL 2356145 at *5 (S.D.N.Y. Aug. 14, 2006) (ALJ did not properly apply the treating physician rule when he did not address the treating physician's "qualifications, or the length, frequency, nature and extent of his relationship with the plaintiff").

Moreover, "the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'"  Burgess v. Astrue, 537 F.3d at 129.  ALJ Edgell set forth her reasons for not giving "full credence" to  Dr. Hiraldo's opinion, as follows:

> [T]he undersigned does not accord full credence to the mental restrictions assessed by Dr. Mejias-Hiraldo, particularly with respect to assessed marked concentration deficits.  This is because such a degree of limitation is not supported by the totality of the medical evidence.  In this regard, it is noted that psychologist Minardo chronicled that the claimant's attention and concentration were grossly intact.  It is also pointed out that all mental status evaluations showed that claimant was alert and fully oriented.  Thus, while some probative weight is granted to Dr. Mejias-Hiraldo's impressions, they cannot be fully adopted.

(R. 27.)  While ALJ Edgell specifically mentioned the § 12.04(B) criteria, she failed to sufficiently discuss Dr. Hiraldo's favorable finding that Jennings met the § 12.04(C) criteria.  See Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

The Second Circuit has held that remand is appropriate where "the ALJ and the Appeals Council failed to give any reasons for not crediting . . . assessments of [plaintiff's] condition by her treating psychiatrist." Newbury v. Astrue, 321 F. App'x 16, 17 (2d Cir. 2009).  Furthermore,

> "[r]eserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even-and perhaps especially-when those dispositions are unfavorable."

Id. at 17 (quoting Snell v. Apfel, 177 F.3d at 134); see, e.g., Morales v. Barnhart, 218 F. Supp. 2d 450, 460 (S.D.N.Y. 2002) (reversing an ALJ's disability determination because "the ALJ did not mention, much less discuss" the relevant Listing).

The Commissioner argues that "[a]lthough the ALJ referred '[s]pecifically' to the four paragraph B criteria, . . . that does not establish that the ALJ did <u>not</u> consider the paragraph C criteria." (Dkt. No. 11: Gov't Br. at 17-18.)  However, "[a] reviewing court may not accept appellate counsel's post hoc rationalizations for agency action."  <u>Newbury</u> v. <u>Astrue</u>, 321 F. App'x at 18 (quotations omitted).  "The ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests and must address all pertinent evidence in the record in this analysis."  <u>Rodriguez</u> v. <u>Astrue</u>, 07 Civ. 0534, 2009 WL 637154 at *16 (S.D.N.Y. Mar. 9, 2009); <u>see also</u>, <u>e.g.</u>, <u>Colon</u> v. <u>Apfel</u>, 133 F. Supp. 2d 330, 343 (S.D.N.Y. 2001) ("Conclusory findings without explanation and analysis have little or no value.").  While ALJ Edgell refers to the section 12.04 A and B criteria, she never mentions the C criteria despite Dr. Hiraldo's finding that Jennings met the C criteria.  Thus, ALJ Edgell did not properly apply the treating physician rule.

"Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration."  <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 124 (2d Cir. 2000); <u>see</u>, <u>e.g.</u>, <u>Meadors</u> v. <u>Astrue</u>, 370 F. App'x 179, 183-84 (2d Cir. 2010); <u>Parker</u> v. <u>Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980); <u>Baldwin</u> v. <u>Astrue</u>, 07 Civ. 6958, 2009 WL 4931363 at *28 (S.D.N.Y. Dec. 21, 2009); <u>Pimenta</u> v. <u>Barnhart</u>, 05 Civ. 5698, 2006 WL 2356145 at *7 (S.D.N.Y. Aug. 14, 2006); <u>Acosta</u> v. <u>Barnhart</u>, 99 Civ. 1355, 2003 WL 1877228 at *15 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); <u>Jones</u> v. <u>Apfel</u>, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999) (Pauley, D.J. & Peck, M.J.) (& cases cited therein); <u>Craven</u> v. <u>Apfel</u>, 58 F. Supp. 2d 172, 187-88 (S.D.N.Y. 1999) (Preska, D.J. & Peck, M.J.).  However, if "the record provides persuasive proof of disability and a remand for further evidentiary proceedings

would serve no purpose," the Court may order a remand solely "for calculation and payment of benefits."  Parker v. Harris, 626 F.2d at 235.  In this case, a remand to the Commissioner is appropriate in order for the Commissioner to expressly consider Dr. Hiraldo's evidence that Jennings met the § 12.04(C) criteria.

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Jennings was not disabled within the meaning of the Social Security Act during the period October 1, 2005 to August 19, 2009 is not supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 10) should be DENIED, and Jennings' motion for judgment on the pleadings (Dkt. No. 8) should be GRANTED and the case remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan, 500 Pearl Street, Room 640, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Sullivan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298,

34

300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:       New York, New York
             October 3, 2011

Respectfully submitted,

**Andrew J. Peck**
United States Magistrate Judge

Copies **by ECF** to:    Charles E. Binder, Esq.
                         Leslie A. Ramirez-Fisher, Esq.
                         Judge Richard J. Sullivan